IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

JASON BRISMAN,

                Plaintiff,

    v.

QUINN, Lieutenant, Auburn
Correctional Facility, *et al.*,

                Defendants.

_____

Civil Action No.
9:15-CV-0712 (LEK/DEP)

APPEARANCES:            OF COUNSEL:

FOR PLAINTIFF:

JASON BRISMAN, *Pro Se*
95-A-6077
Elmira Correctional Facility
P.O. Box 500
Elmira, NY 14902

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN    KYLE W. STURGESS, ESQ.
New York State Attorney General   Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Jason Brisman, a New York State prison inmate, has commenced this civil rights action pursuant to 42 U.S.C. § 1983 against forty-five individuals, all but one of whom were employed at the Auburn Correctional Facility ("Auburn") at the relevant times. Throughout the course of the litigation, the scope of plaintiff's action has been narrowed to include eleven defendants, who are accused of violating plaintiff's constitutional rights under the First and Eighth Amendments to the United States Constitution.

Currently pending before the court is a motion brought by the remaining eleven defendants for the entry of summary judgment in their favor dismissing plaintiff's surviving claims. For the reasons set forth below, I recommend that defendants' motion be granted in part, but otherwise denied.

I.      BACKGROUND[1]

Plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Dkt. Nos. 1, 39. Although he is now confined

---

[1]      In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the non-movant's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

elsewhere, at the times relevant to his claims in this action he was housed in Auburn. Dkt. No. 1 at 20.

Plaintiff alleges that on the morning of February 5, 2015, he was studying in his cell when his cell door opened and an unidentified person began assaulting him. Dkt. No. 29-3 at 11. A minute or two later, defendant R. Knight, a corrections officer, arrived and handcuffed plaintiff. *Id.* at 20, 22, 28. After plaintiff was restrained, defendant Knight slammed plaintiff's head into the bars of the cell door and punched him in the back of the head two or three times. *Id.* at 24, 31, 36-37. Plaintiff further alleges that during the assault, defendant Knight destroyed his religious property. Dkt. No. 1 at 27; Dkt. No. 29-3 at 50, 58-59.

Sometime in March 2015, plaintiff was notified that he had a package in the mailroom. Dkt. No. 29-3 at 134. When he arrived, defendant Volpe, a corrections sergeant, told him that the package he had come to retrieve "is coming up missing" and that future packages would "continue to come up missing if [he continued] writing up grievances[.]" *Id.* at 135. Plaintiff alleges that, thereafter, and specifically between March 16, 2015 and April 3, 2015, he did not receive any mail. Dkt. No. 1 at 22; Dkt. No. 29-3 at 146-47.

According to plaintiff, between March 25, 2015 and May 4, 2015,

defendants E. Lauckern[2] and Carpenter, both of whom are identified by plaintiff as corrections officers,[3] failed to address plaintiff's concerns regarding the sanitary conditions in his cell, including a clogged sink and toilet, a broken mattress, a bent bedframe, and roaches. Dkt. No. 1 at 25; *see also* Dkt. No. 29-6 at 13. In addition, plaintiff alleges that defendant Lauckern denied plaintiff's requests for a medical shower on April 6, 2015 and April 8, 2015, and defendant Carpenter denied the same request from plaintiff on April 25, 2015. Dkt. No. 1 at 24-25.

On April 24, 2015, at approximately 5:00 PM, plaintiff was interviewed at his cell by Sergeant Calandra, who is not a defendant in this action, regarding some of the grievances Brisman had filed concerning, *inter alia*, mail tampering. Dkt. No. 1 at 28; Dkt. No. 29-3 at 156-57, 159. According to plaintiff, defendant McCabe, a corrections officer, was standing outside of plaintiff's cell during the interview. Dkt. No. 29-3 at 163. A few minutes after the interview concluded, defendant McCabe asked

---

[2]     Plaintiff sued this individual as defendant "Lauker." *See, e.g.,* Dkt. No. 1 at 25. It appears from a declaration submitted by defendants in support of their motion, however, that the correct spelling of this individual's last name is "Lauckern." Dkt. No. 29-6. The clerk of the court is respectfully requested to modify the docket to reflect the correct spelling of this individual's last name.

[3]     In his declaration submitted in support of defendants' motion, defendant Carpenter states that he was a "First Officer in A-Block" at Auburn during 2015. Dkt. No. 29-7 at 1.

plaintiff whether he had spoken to the sergeant, and plaintiff answered in the affirmative. Dkt. No. 1 at 28; Dkt. No. 29-3 at 157, 160-61. Defendant McCabe immediately issued plaintiff a misbehavior report for not complying with the count, during which corrections officers count "how many individuals are in their cell or out of their cells." Dkt. No. 29-3 at 158; *see also* Dkt. No. 1 at 28. According to defendant McCabe, the count with which plaintiff was accused of not complying occurred at or around 5:00 PM. Dkt. No. 29-10 at 2. Plaintiff alleges that he was present for and complied with the count, and that defendant McCabe's misbehavior report was issued in retaliation for plaintiff's filing of grievances. Dkt. No. 1 at 28-29.

On May 4, 2015, at approximately 9:00 AM, while plaintiff and at least one other inmate were being escorted in the facility by defendant Lapinksie, a corrections officer, defendants Lieutenant Quinn, Sergeant J. Yung, and Corrections Officers Lepinskie, J. ton, and J. Osborne all assaulted plaintiff. Dkt. No. 1 at 29; Dkt. No. 29-3 at 66, 73. At his deposition, plaintiff could not remember many of the details surrounding the assault. Dkt. No. 29-3 at 65-78.

## II.  PROCEDURAL HISTORY

Plaintiff commenced this action on or about June 10, 2015, and sought leave to proceed in the matter *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Plaintiff's complaint named forty-five individuals as defendants, all but one of whom were employed by the DOCCS and stationed at Auburn in some capacity.[4]  *See generally* Dkt. No. 1.

On August 28, 2015, Senior District Judge Lawrence E. Kahn issued a decision and order pursuant to 28 U.S.C. §§ 1915(e), 1915A, granting plaintiff's IFP application and dismissing several causes of action and thirty-four defendants in this suit. Dkt. No. 5. The following claims have survived Judge Kahn's initial review: (1) Eighth Amendment excessive force claim asserted against defendants Knight, "Speedy" Doe, Quinn, Yung, Osborne, Johnston, and Lepinskie; (2) First Amendment free exercise claim asserted against defendant Knight; (3) Eighth Amendment conditions of confinement claim asserted against defendants Lauckern and Carpenter; (4) First Amendment mail interference claim asserted against defendant Volpe; and (5) First Amendment retaliation claim asserted against defendant McCabe. *Id.* at 22-23.

---

[4]      The forty-fifth defendant, Karen Bellamy, is the DOCCS Director of the Inmate Grievance Program.

On October 4, 2016, defendants filed the currently pending motion for summary judgment. [Dkt. No. 29](#). In their motion, defendants contend that plaintiff's remaining causes of action are subject to dismissal for various reasons, including plaintiffs' failure to exhaust the administrative remedies available to him prior to filing suit and their entitlement to qualified immunity. Plaintiff has since filed an opposition to defendants' motion, and defendants have submitted a reply in further support of their motion. Dkt. Nos. 32, 34-36, 38.

Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.  DISCUSSION

A.  Legal Standard Governing Summary Judgment Motions

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no

reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

    B.    <u>Failure to Exhaust Available Administrative Remedies</u>

Defendants contend that all of plaintiff's Eighth Amendment excessive force claims asserted against defendants Knight, Quinn, Yung, Osborne, Johnston, and Lepinskie, as well as plaintiff's First Amendment free exercise claim asserted against defendant Knight, are subject to dismissal because plaintiff failed to exhaust the available administrative remedies with respect to those claims prior to filing his complaint in this action. Dkt. No. 29-2 at 7-12.

    1.    <u>Applicable Legal Standard</u>

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such

administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is mandatory and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed to fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *see also Wilson v. McKenna*, 661 F. App'x 750, 752 (2d Cir. 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).[5]

In New York, state prison inmates have a grievance procedure

---

[5] While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "'in a substantive sense,'" an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

available to them, designated as the Inmate Grievance Program ("IGP").[6] *Williams*, 829 F.3d at 119. The IGP is comprised of specific steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* "Harassment grievances," which are at issue in this case, are defined as "those grievances that allege employee misconduct meant to annoy, intimidate or harm an inmate," *id.* at § 701.2(e), and are subject to an expedited review in the first instance by the facility superintendent. *Id.* at § 701.8(b); *Williams*, 829 F.3d at 119-20. Specifically, the grievance clerk must forward the harassment grievance to the superintendent by close of business on the same day it was filed. 7 N.Y.C.R.R. § 701.8(b); *accord, Williams*, 829 F.3d at 120. If the superintendent determines that the grievance presents a "bona fide case of harassment," he has twenty-five days to initiate an investigation, render a decision, and inform the inmate

---

[6]     In addition to my recitation that follows, Cheryl Parmiter, the IGP Supervisor at Auburn, has included a description of the relevant IGP steps in her declaration submitted in support of defendants' pending motion. Dkt. No. 29-5 at 2.

of the decision.[7] 7 N.Y.C.R.R. § 701.8(c), (d), (f); *accord, Williams*, 829 F.3d at 120. A grievant may then appeal the superintendent's decision to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.8(h).

In the event the superintendent fails to timely respond in accordance with the IGP, an inmate is permitted to appeal the non-response to the CORC. 7 N.Y.C.R.R. § 701.8(g); *see also id.* at § 701.6(g)(2) (stating that matters not decided within the prescribed time limits "may be appealed to the next step"); *accord, Williams*, 829 F.3d at 120. Generally, if a plaintiff fails to follow each of the required steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

---

[7]     In the event the superintendent determines that the grievance does not present a *bona fide* case of harassment, the superintendent is required to return the grievance to the Inmate Grievance Resolution Committee "for normal processing." 7 N.Y.C.R.R. § 701.8(c).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA.[8] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative

---

[8]     According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

        2.   <u>Analysis</u>

           a.   <u>Defendant Knight</u>

Plaintiff contends that he drafted and filed a grievance on February 10, 2015, concerning the incident involving defendant Knight on February 5, 2015. Dkt. No. 29-3 at 49-50; *see also* Dkt. No. 1-2 at 12-14; Dkt. No. 29-4 at 15-17. The record evidence supporting plaintiff's contention includes a copy of the grievance, which is attached to his complaint. Dkt. No. 1-2 at 12-14; *see also* Dkt. No. 29-4 at 15-17. In addition, at his deposition, plaintiff specifically testified that he filed the grievance. Dkt. No. 29-3 at 49-50.

In contrast to the evidence submitted by plaintiff, Cheryl Parmiter, the Auburn IGP Supervisor, submitted a declaration in which she contends that, based on her review of the pertinent IGP files, plaintiff did not file the

purported grievance regarding the incident on February 5, 2015, involving defendant Knight. *See* Dkt. No. 29-5 at 3 ("[My] search [of the IGP files] revealed that no grievances were filed regarding allegations against officer Knight and/or allegations of excessive use of force and religious freedom claims for an incident that occurred on February 5, 2015."). Jeffrey Hale, the DOCCS Assistant Director of the IGP, stated in his declaration that plaintiff never filed an appeal to the CORC concerning the incident involving defendant Knight on February 5, 2015. Dkt. No. 29-4 at 3. Plaintiff acknowledged in his deposition that he did not receive a response to the grievance he alleges he submitted regarding the matter. Dkt. No. 29-3 at 52. Although plaintiff stated that he "may have wrote" to Parmiter regarding the failure to receive a response from the grievance office about his grievance, *id.* at 54, there is no record evidence to support this allegation.

In light of the evidence currently before the court, I conclude that plaintiff failed to exhaust the administrative remedies available to him with respect to his First and Eighth Amendment claims asserted against defendant Knight. Even assuming plaintiff did file the grievance concerning the incident on February 5, 2015, complaining of the alleged assault and destruction of religious property, there is no evidence that plaintiff

appealed the non-response through to the CORC. Dkt. No. 29-4 at 3.

Indeed, plaintiff only contends that he "may have" written to Parmiter

concerning the non-response, but, assuming this is true, this is not

sufficient for exhaustion purposes, which requires that plaintiff follow all of

the steps prescribed in the IGP. *Ruggerio*, 467 F.3d at 176. Because the

IGP does not include writing to the facility IGP supervisor, and because

the IGP has been interpreted by courts in this circuit as requiring inmates

to appeal to the next level when they do not receive a timely response to

their grievance, plaintiff should have appealed to the CORC when he

failed to receive a written response to the grievance he allegedly filed. *See*

7 N.Y.C.R.R. § 701.6(g)(2) ("[M]atters not decided within the time limits

may be appealed to the next step."); *Dabney v. Pegano*, 604 F. App'x 1, 4-

5 (2d Cir. 2015) (citing 7 N.Y.C.R.R. § 701.6(g) and concluding that, based

on that provision, the plaintiff had "an unimpeded path to the CORC,

notwithstanding his claims that the Great Meadow grievance clerk failed to

process his complaint and that the Clinton superintendent ignored his

appeal"); *Hyliger v. Gebler*, 624 F. App'x 780, 782 (2d Cir. 2015) ("Under

the regulations. . ., if at any step of the grievance process[] an inmate did

not receive a response within the specified timeframe, he was nonetheless

permitted to appeal to the next step. Thus, when [the plaintiff] did not

receive a written response from the IGRC, appeal to the superintendent was still an available administrative remedy." (quotation marks, alteration, citation, and footnote omitted)). The record in this case shows, without contradiction, that while plaintiff appealed other grievance denials to the CORC, he did not do so in connection with his allegations against defendant Knight regarding the incident on February 5, 2015. Dkt. No. 29-4 at 3, 6-9. This default constitutes a failure to exhaust available administrative remedies for purposes of the PLRA.

I note that, to the extent plaintiff contends that he satisfied the exhaustion requirements under the PLRA by appealing the disciplinary hearing determination rendered following defendant Knight's issuance of a misbehavior report to plaintiff concerning the incident on February 5, 2015, Dkt. No. 32 at 26; Dkt. No. 35-1, it is well established that appealing a disciplinary hearing determination is no substitute for filing and pursuing to completion a grievance through the IGP. *See, e.g., McCoy v. Goord*, 255 F. Supp. 2d 233, 256 (S.D.N.Y. 2003).

Finally, there is no evidence in the record that the IGP was unavailable to plaintiff such that he could not properly exhaust administrative remedies. Plaintiff argues in his memorandum of law, submitted in opposition to the pending motion, that, while the grievance

procedures were "technically" available to him, they were "so opaque and confusing that they were incapable of use[.]" Dkt. No. 32 at 26-27. The evidence in the record, however, does not support plaintiff's conclusions. Indeed, the evidence reflects that plaintiff filed sixty-two grievances between 2014 and 2015 while confined in Auburn, and appealed forty-nine grievances to the CORC while in the custody of the DOCCS. Dkt. No. 29-4 at 6-9; Dkt. No. 29-5 at 6-14. This evidence alone suggests that the IGP is not so opaque or was otherwise so difficult to understand such that it was functionally unavailable to plaintiff.

I note, moreover, that in his deposition, when asked whether he was prohibited from filing the grievance he alleges he filed, plaintiff answered, "No." Dkt. No. 29-3 at 54. In his memorandum of law, plaintiff merely speculates that the grievance clerk "may have incorrectly rejected plaintiffs [sic] grievance as a complaint about a non-grievable issue," but there is no evidence to support this contention. *Id.* at 27.

In short, there is no record evidence to support plaintiff's allegation that the grievance procedures set forth in the IGP were unavailable to him. Accordingly, I recommend that defendants' motion be granted with respect to plaintiff's First and Eighth Amendment claims asserted against defendant Knight.

b.      Defendants Quinn, Yung, Osborne, Johnston, and Lepinskie

The parties do not dispute that plaintiff filed a grievance concerning the incident on May 4, 2015, involving plaintiff's allegations that defendants Quinn, Yung, Osborne, Johnston, and Lepinskie assaulted him. Dkt. No. 1-2 at 27-29; Dkt. No. 29-5 at 4, 20-22. The grievance is identified in the record as grievance number "AUB-67240-15." *Id.* Plaintiff testified at his deposition that he "think[s]" he appealed the response from the superintendent to the CORC and that he received a "negative response" from the CORC.[9] Dkt. No. 29-3 at 95. In support of this

---

[9]      Plaintiff's deposition transcript is slightly confusing with respect to whether he appealed the superintendent's decision regarding his grievance to the CORC. Dkt. No. 29-3 at 94-95. In particular, the transcript reflects the following question-and-answer exchange between plaintiff and defendants' counsel:

Q      Okay. Did you receive a response to this grievance that you wrote?
A      I believe so.
Q      And what did you do with that response? Or excuse me, do you remember what it was?
          It's okay if you don't, I just want to know.
A      No, I don't recall. I think I got a CRC. I'm not sure if it was a CRC. I know I got a response to it. It's been a while. Most of this stuff, I don't have.
Q      So do you know if you filed an appeal?
A      Yes.
Q      To court?
A      Yes.
Q      You did?
A      Yes.
Q      Absolutely?
A      Yes.
Q      When did you file that?

testimony and in opposition to defendants' motion, plaintiff submitted a copy of the superintendent's decision denying grievance number AUB-67240-15. Dkt. No. 34 at 65. The bottom of the decision contains plaintiff's appeal statement, and plaintiff contends that he filed the appeal by giving it to a corrections officer at the Southport Correctional Facility on July 7, 2015. *Id.*; Dkt. No. 32 at 27. Defendants, however, maintain that this document was not provided to them during the course of discovery in this case. Dkt. No. 38 at 5. In support of their motion, defendants filed the same superintendent decision that plaintiff submitted, except the bottom portion with plaintiff's appeal statement is blank. Dkt. No. 29-3 at 197. In his declaration submitted in support of defendants' motion, Hale states that he found no appeal from grievance number AUB-67240-15 on file with the CORC. Dkt. No. 29-4 at 3. In addition, the record does not contain any response from the CORC regarding grievance number AUB-67240-15.

---

> A    As soon as I got the response from the superintendent.
> Q    Do you know what the result was of the CORC review?
> A    It may have been a negative response, I mean.

*Id.* In light of the context of this exchange, I have assumed that defendants' counsel asked plaintiff whether he filed his appeal to the CORC, rather than the "court," and that the reference to the "court" is a typographical error.

In light of the foregoing, it appears that defendants' motion asks the court to render a credibility determination as to whether plaintiff actually filed an appeal of grievance number AUB-67240-15 to the CORC. The court has been presented with competing evidence with respect to this issue. On the one hand, plaintiff has presented evidence that purports to be his appeal to the CORC. Defendants, in contrast, have presented sworn testimony from the DOCCS Assistant Director of the IGP that suggests plaintiff never filed an appeal to the CORC. Because the record contains evidence upon which a factfinder could conclude that plaintiff did appeal to the CORC and, therefore, satisfied the required steps under the IGP for purposes of exhaustion, I recommend that defendants' motion be denied with respect to plaintiff's Eighth Amendment excessive force claims asserted against defendants Quinn, Yung, Osborne, Johnston, and Lepinskie. I further recommend that the court conduct an exhaustion hearing pursuant to *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011), prior to any trial, to make a final determination regarding whether plaintiff exhausted the available administrative remedies concerning this claim.

C.     Plaintiff's Conditions of Confinement Claims

Plaintiff's complaint asserts Eighth Amendment conditions of confinement claims against defendants Lauckern and Carpenter based on allegations that those individuals (1) failed to address plaintiff's concerns regarding the sanitary conditions in his cell, and (2) denied plaintiff's requests for medical showers on certain occasions.[10] Dkt. No. 1 at 24-25.

1.     Applicable Legal Standard

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or 'involve[s] the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)). While the Eighth Amendment "'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)); *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

A claim alleging that prison conditions have violated the Eighth

---

[10]     Whether plaintiff's medical-shower claim was dismissed by Judge Kahn in his initial order reviewing plaintiff's complaint pursuant to 28 U.S.C. §§ 1915(e), 1915A will be discussed more completely below in part III.C.2.b. of this report.

Amendment must satisfy both an objective and a subjective requirement. *Walker*, 717 F.3d at 125; *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996). To satisfy the objective element, "the plaintiff must demonstrate that the conditions of his confinement result in 'unquestioned and serious deprivations of basic human needs.'" *Jolly*, 76 F.3d at 480 (quoting *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985)); *see also Walker*, 717 F.3d at 125 ("To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health."). In a prison setting, basic needs include "food, clothing, medical care, and safe and sanitary living conditions." *Walker*, 717 F.3d at 125 (*citing, inter alia, Rhodes*, 452 U.S. at 347). As to the subjective requirement, "the plaintiff must demonstrate that the defendants imposed those conditions with 'deliberate indifference.'" *Jolly*, 76 F.3d at 480 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *see also Walker*, 717 F.3d at 125; *Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.).[11] Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or

---

[11]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Walker*, 717 F.3d at 125; *Waldo*, 1998 WL 713809, at *2.

With this backdrop in mind, I will address each of plaintiff's conditions of confinement claims asserted against defendants Lauckern and Carpenter separately below.

2.    Analysis

a.    Allegations Regarding Sanitary Conditions in Plaintiff's Cell

With respect to plaintiff's claim that defendants Lauckern and Carpenter ignored plaintiff's complaints of unsanitary conditions within his cell, plaintiff's complaint specifically alleges as follows:

> From on or about March 25, 2015 to May 4, 2015, plaintiff was forced to live in a unsanitary cell (A-5-19) where the sink was stopped up, the toilet did not flush, the mattress was in disrepair, the bed frame was bent, the locker and desk were infested with roaches and the power was cut off. Plaintiff addressed this to defendants correction officer E. Laucker and first officer of A. block correction officer Carpenter but found no redress.

Dkt. No. 1 at 25 (errors in original).

The undisputed record evidence in this case reflects that all of the conditions plaintiff complained of were addressed in a timely manner

following plaintiff's complaints. Plaintiff submitted a grievance dated April 6, 2015, alleging that he moved into his cell, A-5-19, two weeks earlier, and, although he had spoken to "the area supervisor and the area officer," the following issues remained unaddressed:

1. Sink is stopped up.
2. Toilet does not flush.
3. Mattress is in disrepair.
4. Bed frame is bent . . .
5. Wall jack does not work.
6. Locker and desk are infested with roaches.

Dkt. No. 29-6 at 13. Upon receiving the grievance when he was working in the grievance office, defendant Lauckern reviewed it and determined which issues required work orders. *Id.* at 2-3. Because the sink issue had previously been addressed on March 22, 2015, defendant Lauckern did not place a work order for it to be fixed again. *Id.* at 8; Dkt. No. 29-3 at 223. Work orders were submitted for the clogged toilet, and the record evidence reflects that on both April 14 and April 17, 2015, the work was complete. Dkt. No. 29-3 at 225, 228. A work order to address the broken wall jack was submitted on April 13, 2015, though it was not fixed until July 9, 2015, due to plumbing repairs that had to be addressed first. *Id.* at 227. Plaintiff's cell was scheduled to be visited by the exterminator on April 29, 2015. Dkt. No. 29-6 at 3, 8. In addition, plaintiff was placed on the waitlist for a new mattress no later than April 30, 2015. *Id.* at 8. Defendant

Lauckern also issued a work order on April 28, 2015, to address plaintiff's broken bed frame. Dkt. No. 29-3 at 226. Accordingly, all of the various cell conditions complained of on April 6, 2015, had been addressed, in some manner, by April 30, 2015, less than one month later.

In light of the foregoing, no reasonable factfinder could conclude that plaintiff's Eighth Amendment rights were violated based on the conditions of his confinement in cell A-5-19 between March 25, 2015 and May 4, 2015, as alleged by plaintiff. The conditions complained of were not sufficiently serious to pose a serious risk of harm to plaintiff, nor do they present a risk of denying plaintiff any of life's basic necessities. The work orders reflect that plaintiff's sink had already been repaired by the time plaintiff filed his grievance. Dkt. No. 29-3 at 223. The toilet was addressed twice during the relevant timeframe, once on April 14, 2015, just eight days after plaintiff filed his grievance, and again on April 17, 2015. *Id.* at 225, 228. Exterminators are scheduled to visit Auburn either monthly or bi-weekly, and plaintiff's cell was scheduled for a visit on April 29, 2015, within the same month plaintiff aired his complaint. Dkt. No. 29-6 at 3. With respect to the remaining issues regarding plaintiff's bedframe, wall jack, and mattress, while they do not present the same kind of immediate hygienic concerns as the others, they were also timely addressed.

In any event, even assuming that all of the issues complained of by plaintiff presented a substantial risk to his health or safety, as defendants highlight in their motion papers, "prison officials who actually knew of [such a risk] may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Here, no reasonable factfinder could conclude based on the record evidence that defendants did not reasonably respond to plaintiff's complaints concerning the sanitary conditions of his cell during the relevant timeframe.

Accordingly, because the record does not give rise to a genuine dispute of material fact regarding either the objective or subjective elements of plaintiff's Eighth Amendment claim concerning the sanitary conditions in his cell between March 25, 2015 and May 4, 2015, I recommend that defendants' motion be granted.

b.   Allegations Regarding Denial of Medical Showers

Plaintiff's complaint alleges that defendant Lauckern denied him his request for a medical shower on April 6, 2015, and again on April 8, 2015. Dkt. No. 1 at 24-25. In addition, plaintiff alleges that, although defendant Lauckern granted plaintiff's request for a medical shower on March 27, 2015, during the shower, "the water became freezing and the pressure

was cut off." *Id.* at 24. Plaintiff's complaint also alleges that defendant Carpenter denied plaintiff his medical shower on April 25, 2015. *Id.* at 25.

The parties dispute whether this claim remains pending in the action following Judge Kahn's decision issued on August 28, 2015 (Dkt. No. 5). *Compare* Dkt. No. 32 at 29-30 *with* Dkt. No. 38 at 6. In the same paragraph in which he discusses plaintiff's allegations specifically against defendants Lauckern and Carpenter concerning the sanitary conditions in his cell, Judge Kahn also notes that the complaint alleges that plaintiff was "denied his medical shower on several occasions." Dkt. No. 5 at 12 (quotation marks omitted). In addition, the decision only specifically dismissed plaintiff's medical-shower claim asserted against defendant McCarthy and did not otherwise contain any analysis with respect to the allegations regarding medical showers against defendants Lauckern and Carpenter. *Id.* at 13 n.10. Accordingly, although I agree that it is not perfectly clear, based on my review of the earlier court order, I believe the medical-shower claim asserted against defendants Lauckern and Carpenter survived initial review under 28 U.S.C. §§ 1915(e), 1915A.

Although defendants did not move for summary judgment seeking dismissal of the medical-showers claim against defendants Lauckern and Carpenter, which ordinarily might suggest plaintiff is not on notice that the

claim is subject to dismissal and that *sua sponte* dismissal is foreclosed, *see e.g., Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991), in this instance, I find that *sua sponte* review of the claim at this juncture is appropriate. It is clear from plaintiff's opposition to the pending motion that he is aware that the medical-showers claim may be subject to dismissal and specifically defends against dismissal by addressing the merits of the claim. Dkt. No. 38 at 29-30. Indeed, plaintiff cites to record evidence in his response that purportedly supports the substance of his claim. *See id.* at 29 ("Plaintiff addressed these issues to defendants Laucker[n] and Carpenter on a daily basis, so they were aware (D. 6-8); (C. 18-19); (Ex: D; L).)"). Accordingly, I have proceeded below with an analysis of the medical-showers claim asserted against defendants Lauckern and Carpenter. *Cf. Wachtler v. Cnty. of Herkimer*, 35 F.3d 77, 82 (2d Cir. 1994) (affirming the district court's *sua sponte* dismissal of the plaintiff's claim against a particular defendant because, *inter alia*, the plaintiff was "given notice that the 'defendants' were moving to dismiss or for summary judgment. . . [and] was allowed to respond by submitting a 150-page legal memorandum in response to the [defendants'] motions").

As was discussed above, an Eighth Amendment conditions of confinement claim must satisfy both the objective and subjective elements.

*Walker*, 717 F.3d at 125. In this case, plaintiff has failed to demonstrate a genuine dispute of material fact with respect to the objective element. While plaintiff's memorandum of law contends that defendants Lauckern and Carpenter denied him medical showers "for over a month," Dkt. No. 32 at 30, the only evidence in the record that supports this claim is plaintiff's complaint, which specifically alleges that defendant Lauckern denied him a shower on two occasions – once on April 6, 2015, and again on April 8, 2015 – and that defendant Carpenter denied him one shower on April 25, 2015. Dkt. No. 1 at 24-25. In his deposition, plaintiff testified that he was provided only one shower between March 24, 2015 and May 4, 2015, but he did not testify that either defendants Lauckern or Carpenter was responsible for denying him all showers during the entire period. Dkt. No. 29-3 at 107-08, 124-25. Thus, even when all inferences are drawn in favor of plaintiff, the only evidence in the record with respect to defendants Lauckern and Carpenter denying plaintiff's request for medical showers is plaintiff's complaint, which alleges that, at most, defendant Lauckern denied him two showers and defendant Carpenter denied him one shower during the relevant six-week time period. Dkt. No. 1 at 24-25. Such allegations do not rise to a level sufficient to establish a cognizable Eighth Amendment cause of action. *See, e.g., Markiewicz v.*

*Washington*, No. 97-3589, 1999 No 196596, at *1 (7th Cir. 1999) (affirming the district court's dismissal of the plaintiff's Eighth Amendment claim where the plaintiff alleged that he was twice denied a shower); *Diaz v. Fischer*, No. 08-CV-1208, 2010 WL 1132772, at *6 (N.D.N.Y. Feb. 23, 2010) (Homer, M.J.) (finding that the plaintiff's allegations that, while in disciplinary confinement, "he had a stained mattress, dirty walls and sink, . . . lacked a desk and foot locker. . . [and] was not offered a shower for two days are . . . insufficient to state an Eighth Amendment violation"); *see also Beckford v. Portuondo*, 151 F. Supp. 2d 204, 211 (N.D.N.Y. 2001) (Kahn, J.) ("Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers."). Accordingly, I recommend that plaintiff's conditions of confinement claim asserted against defendants Lauckern and Carpenter regarding plaintiff's requests for a medical shower be dismissed.

## D.    Plaintiff's Mail Interference Claim

Plaintiff's First Amendment mail interference claim arises from allegations that from March 16, 2015 until April 3, 2015, plaintiff did not receive his mail because of defendant Volpe's conduct. Dkt. No. 1 at 22. Defendants seek dismissal of the claim because, according to them, the record evidence only demonstrates that, at most, plaintiff did not receive

one package containing religious property and that this is not sufficient to raise a genuine dispute of material fact with respect to whether plaintiff's First Amendment rights were violated. Dkt. No. 29-2 at 16-20.

      1.   Applicable Legal Standard

While inmates confined in prison facilities are by no means entitled to the full gamut of rights guaranteed under the United States Constitution, including the First Amendment, they do retain at least some measure of constitutional protection. *Beard v. Banks*, 548 U.S. 521, 528 (2006). A prison inmate's right to freedom of speech, however, is not without limits, and the task of defining the contours of that right in a prison setting requires striking a delicate balance between the rights of prison inmates and the legitimate interests of prison officials charged with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348-49 (1987); *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003); *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990).

Among the constitutional protections enjoyed by prison inmates is the "right to the free flow of incoming and outgoing mail[.]" *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). That right, however, gives way to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal

activities, in which case no constitutional violation has occurred. *United States v. Workman*, 80 F.3d 688, 698 (2d Cir. 1996); *see also Turner v. Safley*, 482 U.S. 78, 89 (1987) (concluding that when a prison regulation or practice "impinges on inmates' constitutional rights, the regulation [or decision] is valid if it is reasonably related to legitimate penological interests"); *accord, Beard*, 548 U.S. at 528.

"[C]ourts have consistently afforded greater protection . . . to outgoing mail than to incoming mail." *Davis*, 320 F.3d at 351. Nonetheless, the Second Circuit has held that, "where good cause is shown, outgoing mail can be read without violating inmates' First Amendment rights." *Workman*, 80 F.3d at 698 (quotation marks omitted).

      2.   <u>Analysis</u>

Defendants contend that plaintiff's deposition testimony is so replete with contradictions that no reasonable factfinder could conclude plaintiff was denied his mail. *See* [Dkt. No. 29-2 at 19](Dkt. No. 29-2 at 19) ("[I]t does not appear that plaintiff was actually denied mail. Plaintiff has simply offered vague, conclusory and vague statements; or plaintiff attempts to offer some testimony that *could* infer a claim for mail interference, but then contradicts his own testimony."). While I agree with defendants that the record evidence with respect to this claim is not conclusive, having reviewed

plaintiff's deposition transcript, I find that there is sufficient evidence to give rise to a genuine dispute of material fact.

Plaintiff testified at his deposition that his mail interference claim involves his failure to receive mail between March 16, 2015 and April 3, 2015. Dkt. No. 39-3 at 130; *see also* Dkt. No. 1 at 22. According to plaintiff, on an unidentified date in March 2015, he went to the mailroom to retrieve his religious tobacco that had apparently been delivered to the facility. Dkt. No. 29-3 at 134. At that time, defendant Volpe informed plaintiff that he supervises the package room at Auburn. *Id.* at 133-34. Defendant Volpe also allegedly told plaintiff that his package "is coming up missing" and that future packages would "continue to come up missing if [plaintiff continued] writing up grievances and [plaintiff refused] to sign off on these grievances." *Id.* at 135. When asked what he meant by "sign off on the grievances," plaintiff testified as follows:

> I guess [defendant Volpe] wanted me to sign off on the grievances pertaining to the package room area where I was receiving stuff that I could have per directive and they were denying it to me. Some of it was religious articles, some of it was exercise, some of it was just every-day, you know, miscellaneous stuff. But he basically told me that he was the reason why my mail and my packages was coming up missing . . . . He told me that he was on medical leave for a certain amount of time. Basically that he wasn't even supposed to be in the facility but he was still making my stuff – my packages and

my mail come up missing.

*Id.* at 135-36; *see also id.* at 146-47 ("**Q** Do you believe that you did not receive your mail between March 16th, 2015, and April 3rd, 2015, because of Sergeant Volpe? **A** Yes. **Q** How do you know? **A** He told me himself. **Q** Told you what? **A** I wasn't going to receive any mail or any of my packages. He told me that himself.").

Plaintiff contends that, following his conversation with defendant Volpe in the mailroom, he did not receive mail from his family and did not receive his packages or legal mail that he was expecting. Dkt. No. 29-3 at 137-38. Plaintiff specifically testified that the following items were not delivered to him: (1) legal mail regarding either "an Aritcle 78 or a . . . CPL 440"; (2) elekes, which are religious beads used in plaintiff's religion; and (3) correspondence from Blackstone Career Institute, a company through which plaintiff was enrolled in a paralegal course. *Id.* at 138-40, 152-53.

Defendants are correct that plaintiff's deposition testimony with respect to this claim, at times, is confusing and/or vague. As an example, while plaintiff at one point contended that his legal mail was not delivered during the relevant timeframe, he later reported that he eventually received what he was expecting once he was transferred to a different correctional facility. Dkt. No. 29-3 at 142. Similarly, plaintiff suggested

earlier in his deposition that he never received the elekes he ordered but then later testified that a corrections officer brought them to his cell and refused to give them to him because they violated prison rules. *Id.* at 148. Plaintiff also testified that there is "a strong possibility" that he did not receive his mail because no mail was sent to him. *Id.* at 152.

Nonetheless, none of the apparent discrepancies in plaintiff's testimony are so strong as to classify them as contradictory or otherwise render the testimony incredible as a matter of law. Instead, plaintiff's unequivocal testimony that he did not receive any mail during the relevant time period at defendant Volpe's direction, *id.* at 146-47, 148, in direct conflict with defendant Volpe's insistence that he did not threaten to withhold any of plaintiff's mail and that any mail withheld was in accordance with prison policy, Dkt. No. 29-8 at 2, gives rise to a genuine dispute of material fact with respect to plaintiff's mail interference claim. Accordingly, I recommend that defendants' motion be denied to the extent it seeks dismissal of plaintiff's First Amendment mail interference claim.

E.    Plaintiff's Retaliation Claim

Plaintiff's retaliation claim asserted against defendant McCabe stems from the allegation that defendant McCabe issued plaintiff a false misbehavior report on or about April 24, 2015, in retaliation for plaintiff

filing a grievance against other corrections officers at Auburn. [Dkt. No. 1 at 28-29](). Defendants contend that no reasonable factfinder could conclude that defendant McCabe retaliated against plaintiff for the particular grievances he cites, and, in any event, no reasonable factfinder could conclude that defendant McCabe was motivated by retaliatory animus when he issued plaintiff the misbehavior report. [Dkt. No. 29-2 at 20-25]().

### 1. Applicable Legal Standard

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v.*

*Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To establish a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must prove that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

If the plaintiff carries this burden, defendants must show, by a preponderance of the evidence, that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287; *accord, Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994). Indeed, where "state action is motivated by both proper and improper reasons, the action may be sustained if it would have been taken even in the absence of the improper reason." *Lowrance*, 20 F.3d at 535.

2.    <u>Analysis</u>

In this case, the record contains sufficient evidence from which a reasonable factfinder could conclude that (1) defendant McCabe retaliated against plaintiff for filing grievances by issuing plaintiff a false misbehavior report, and (2) defendant McCabe was motivated only by retaliatory animus when he issued plaintiff the allegedly false misbehavior report. It is well settled that the filing of grievances constitutes constitutionally protected conduct for purposes of a First Amendment retaliation cause of action. *See, e.g.*, *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004). In addition, the parties do not dispute that defendant McCabe issued plaintiff a misbehavior report accusing him of missing the count on April 24, 2015. *See, e.g.*, [Dkt. No. 29-10 at 2](). As described more below, based on the record evidence, a reasonable factfinder could conclude that defendant McCabe had no basis for issuing the misbehavior report. To the extent, then, that the misbehavior report was false, it constitutes adverse action. *See, e.g.*, *Gill*, 389 F.3d at 384.

The parties' central dispute in this matter focuses on the third element, regarding whether there is a causal connection between the grievances plaintiff filed and defendant McCabe's issuance of the misbehavior report. Defendants contend there is no evidence upon which

a reasonable factfinder could conclude that defendant McCabe issued the misbehavior report against plaintiff out of retaliatory animus for the grievances plaintiff had earlier filed.

As is reflected in the record now before the court, plaintiff alleges that at approximately 5:00 PM on April 24, 2015, Sergeant Calandra, who is not a named defendant, interviewed plaintiff at his cell regarding one or more grievances plaintiff had earlier filed against corrections officers. *See* Dkt. No. 1 at 28; Dkt. No. 29-3 at 156-57, 159. According to plaintiff, during the interview with Sergeant Calandra, defendant McCabe was "standing right in front of [plaintiff's] cell[.]" Dkt. No. 29-3 at 163. After the interview, defendant McCabe arrived at plaintiff's cell and asked whether plaintiff had talked to the sergeant. Dkt. No. 1 at 28; Dkt. No. 29-3 at 157, 160-61. When plaintiff responded in the affirmative, defendant McCabe allegedly told plaintiff that he was issuing him a misbehavior report for "'not being on the count.'" Dkt. No. 1 at 28; *see also* Dkt. No. 29-3 at 157. According to plaintiff, during "the count," corrections officers count "how many individuals are in their cell or out of their cells." Dkt. No. 29-3 at 158. While plaintiff insists that he was inside his cell and talking to Sergeant Calandra during the count, *id.* at 157, 159, defendant McCabe contends that plaintiff complied with the count only after being issued "several direct orders to

get out of his bed and turn his cell light on." Dkt. No. 29-10 at 2.

The above-described evidence reflects the existence of a genuine dispute of fact with respect to (1) whether defendant McCabe actually was aware of the grievances about which plaintiff was being interviewed by Sergeant Calandra, and (2) whether plaintiff complied with the count on that particular day. Drawing all inferences in plaintiff's favor, a reasonable factfinder could infer from plaintiff's testimony that defendant McCabe overheard the conversation between Sergeant Calandra and plaintiff because he was standing outside plaintiff's cell and, based on the conversation, learned of the grievances. In addition, a reasonable factfinder could conclude, if plaintiff's testimony is credited, that he was speaking to Sergeant Calandra during the count, and, therefore, was present and compliant with the count procedures. If plaintiff complied with the count, and defendant McCabe was aware of the grievances plaintiff had earlier filed against corrections officers, a reasonable factfinder could further infer that the issuance of the misbehavior report against plaintiff accusing him of failing to comply with the count was retaliatory.

In addition, although, as noted above, a defendant may prevail on a retaliation claim if he can prove that his actions were taken for both proper and improper reasons, *Lowrance*, 20 F.3d at 535, in light of the parties'

dispute regarding whether plaintiff complied with the count procedures,

summary judgment in defendants' favor is not appropriate on that basis. It

is impossible that both plaintiff's and defendants' version of the events are

true; plaintiff could not have been both speaking to Sergeant Calandra

during the count – and therefore present for it – *and* been lying on his bed

in the dark, refusing to comply with defendant McCabe's orders.

Accordingly, the conflicting record evidence in this case precludes me

from concluding that defendant McCabe's issuance of a misbehavior

report was taken for both proper and improper reasons.

Because genuine disputes of material fact exist with respect to the

third prong of plaintiff's retaliation claim asserted against defendant

McCabe, I recommend defendants' motion be denied as it concerns that

cause of action.

     F.    <u>Qualified Immunity</u>

In the event the above recommendations are adopted by the

assigned district judge, the only claims that will survive the pending motion

are (1) plaintiff's excessive force claim asserted against defendants Quinn,

Yung, Osborne, Johnston, and Lepinskie; (2) plaintiff's mail interference

claim asserted against defendant Volpe; and (3) plaintiff's retaliation claim

asserted against defendant McCabe. Because defendants do not contend

that defendants Quinn, Yung, Osborne, Johnston, and Lepinskie are entitled to qualified immunity from suit concerning plaintiff's excessive force claim, [Dkt. No. 29-2 at 25-26](), I have analyzed only plaintiff's mail interference and retaliation causes of action below.

### 1.    Applicable Legal Standard

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223)).

Because qualified immunity is "an immunity from suit rather than a

mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985),

the Supreme Court has "repeatedly . . . stressed the importance of

resolving immunity questions at the earliest possible stage in the

litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S.

224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from

suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d

Cir. 2011). Specifically, the inquiry turns on whether the facts alleged,

taken in a light most favorable to the plaintiff, show that the conduct at

issue violated a statutory or constitutional right, and if so, whether that

right "was clearly established at the time of the challenged conduct."

*Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132

S. Ct. at 2093). The Supreme Court has said that an officer's "conduct

violates clearly established law when, at the time of the challenged

conduct, the contours of a right are sufficiently clear that every reasonable

official would have understood that what he is doing violates that right."

*Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and

alterations omitted). "To this end, a plaintiff need not show a case 'directly

on point, but existing precedent must have placed the statutory or

constitutional question beyond debate.'" *Terebesi*, 764 F.3d at 230

(quoting *al-Kidd*, 131 S. Ct. at 2083). However, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

　　2.　Analysis

The law is clearly established with respect to the two remaining claims for consideration. As was explained above, it is well settled in this circuit that an inmate has a constitutionally protected right to file a grievance in accordance with prison procedures without being issued a retaliatory and false misbehavior report. *Gill*, 389 F.3d at 384. Similarly, it is well established that prisoners are entitled to the free flow of incoming and outgoing mail, subject to penological concerns. *Davis*, 320 F.3d at 352; *Workman*, 80 F.3d at 698. The allegations concerning defendant Volpe directly implicate that right, where plaintiff contends that defendant Volpe directly informed him that his mail would be withheld if he continued

45

to file grievances. *See, e.g.*, [Dkt. No. 29-3 at 146-47](). As was discussed above in parts III.D. and III.E. of this report, when all inferences are drawn in favor of plaintiff, the record contains evidence upon which a reasonable factfinder could conclude that those clearly established rights were violated.

As for whether reasonable corrections officers would have known that they were violating plaintiff's clearly established rights by engaging in the conduct as alleged by plaintiff, the existence of disputes of material fact in the record precludes me from finding in defendants' favor. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866-68 (reversing the Fifth Circuit Court of Appeals because it "credited the evidence of the party seeking summary judgment and failed to properly acknowledge key evidence offered by the party opposing that motion"). Assuming a factfinder finds in plaintiff's favor based on the record evidence with respect to both the mail interference and retaliation claim, no reasonable corrections officer would conclude either that (1) issuing a directive to withhold an inmate's mail absent a legitimate penological interest did not violate plaintiff's clearly established rights or (2) issuing a false misbehavior report to an inmate in retaliation for the inmate's filing of grievances against corrections officers did not violate plaintiff's clearly established rights. Accordingly, I

recommend the court deny defendants' motion to the extent it seeks qualified immunity.

G.    Status of John "Speedy" Doe

Plaintiff's complaint named John "Speedy" Doe as a defendant. Dkt. No. 1 at 19. To date, plaintiff has failed to ascertain the true identity of that Doe defendant and to serve him with process.

When this action was filed, Rule 4(m) of the Federal Rules of Civil Procedure authorized "the court – on motion or on its own after notice to the plaintiff" – to dismiss a plaintiff's claims against a defendant where a summons and complaint were not served upon that party within 120 days after filing of the complaint, absent a showing of good cause.[12]  Fed. R. Civ. P. 4(m); *see also Shuster v. Nassau Cnty.*, No. 96-CV-3635, 1999 WL 9847, at *1 (S.D.N.Y. Jan. 11, 1999) ("Rule 4(m) authorizes a court upon a motion to dismiss an action without prejudice as against a defendant if service of the summons and complaint is not made upon that defendant within 120 days after the filing of the complaint."); *Romand v. Zimmerman*, 881 F. Supp. 806, 809 (N.D.N.Y. 1995) (McAvoy, J.) ("[T]he 120-day filing

---

[12]    Effective on December 1, 2015, Rule 4(m) was amended to require service of a summons within ninety days. It should be noted, moreover, that the period specified in Rule 4(m) is further restricted by the local rules of this court, which require that service be effectuated within sixty days. N.D.N.Y. L.R. 4.1(b).

requirement applies to pro se plaintiffs as well as those represented by counsel."). This is because when named defendants have not been served or otherwise appeared in the action within this time period, the court does not acquire jurisdiction over them. *See, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F. Supp. 1279, 1282 (S.D.N.Y. 1989) (citing *Miss. Publ'g Corp. v. Murphree*, 326 U.S. 438, 444-45 (1946)).

Upon a showing of good cause, the time for service must be extended. *Panaras v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340 (7th Cir. 1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Panaras*, 94 F.3d at 340 (citing Fed. R. Civ. P. 4(m)); *see also Zapata v. City of N.Y.*, 502 F.3d 192, 196 (2d Cir. 2007) ("We hold that district courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986). When examining whether to extend the prescribed period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *Zapata*, 502 F.3d at 197.

In this case, in his decision following review of plaintiff's complaint

pursuant to 28 U.S.C. §§ 1915(e), 1915A, Judge Kahn determined that plaintiff's cause of action asserted against defendant Doe should proceed and directed plaintiff to take reasonable steps through discovery to learn defendant Doe's identity so that the proper individual could be served with process. Dkt. No. 5 at 10 n.7. Discovery in this matter is now closed, and plaintiff has not yet learned defendant Doe's identity. Dkt. No. 42. Plaintiff was issued an order to show cause why I should not recommend dismissal of defendant Doe at this juncture, Dkt. No. 41, and plaintiff has since responded. Dkt. No. 42. Plaintiff acknowledges his failure to "procure the full name of the 'C.O. Speedy Doe' defendant" and stated that he understands that this individual "will be dismissed from this action[.]" *Id.* In light of plaintiff's response, and his failure to identify and serve defendant Doe, I recommend that the court dismiss that defendant from the action.

IV.    SUMMARY AND RECOMMENDATION

While defendants seek dismissal of the remaining causes of action in this case, the record evidence reveals the existence of genuine disputes of fact with respect to plaintiff's First Amendment mail interference and retaliation claims, thereby precluding the entry of summary judgment in defendants' favor on those claims. The record also does not support a finding at this juncture that either defendant Volpe or McCabe are entitled

to qualified immunity from suit. In addition, the record is equivocal as to whether plaintiff exhausted the available administrative remedies with respect to his excessive force claim asserted against defendants Quinn, Yung, Osborne, Johnston, and Lepinskie.

As for plaintiff's remaining claims, there is no evidence upon which reasonable factfinders could conclude that plaintiff exhausted the available administrative remedies concerning his excessive force or free exercise claim asserted against defendant Knight. Similarly, plaintiff's Eighth Amendment conditions of confinement claims are subject to dismissal at this time in light of the absence of any dispute of material fact regarding whether plaintiff's rights were violated.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 29) be granted in part and denied in part as follows:

(1)  Plaintiff's Eighth Amendment excessive force and First Amendment free exercise claims asserted against defendant Knight, as well as plaintiff's conditions of confinement claims asserted against defendants Laukern and Carpenter, be DISMISSED;

(2)     Plaintiff's (a) Eighth Amendment excessive force claim asserted against defendants Quinn, Yung, Osborne, Johnston, and Lepinskie; (b) First Amendment mail interference claim asserted against defendant Volpe; and (c) First Amendment retaliation claim asserted against defendant McCabe, survive defendants' motion; and it is further

RECOMMENDED that the court conduct an exhaustion hearing prior to any trial in this action pursuant to *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011), with respect to plaintiff's Eighth Amendment excessive force claim asserted against defendants Quinn, Yung, Osborne, Johnston, and Lepinskie; and is further

RECOMMENDED that plaintiff's claims against defendant John "Speedy" Doe be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[13] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

---

[13]     If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules; and it is further

ORDERED that the clerk is respectfully directed to modify the court's docket to reflect the correct spelling of defendant E. Lauckern's name.

David E. Peebles
U.S. Magistrate Judge

Dated:     August 16, 2017
           Syracuse, New York


Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

***1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

## I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

## II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

## III. Discussion

### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

## IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

## V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2010 WL 1132772
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Frederick DIAZ, Plaintiff,

v.

Brian FISCHER, Commissioner, Department of
Corrections; Harold D. Graham, Superintendent,
Auburn Correctional Facility; Steven Byrne,
Lieutenant; Timothy Quinn, Lieutenant; Gregory
Redmond, Lieutenant, Auburn Correctional
Facility; James Cady, Correctional Officer,
Auburn Correctional Facility; Robert Burdick,
Correctional Officer, Auburn Correctional
Facility; and Joseph Merville, Correctional
Officer, Auburn Correctional Facility, Defendants.

No. 08–CV–1208 (LEK/DRH).
|
Feb. 23, 2010.

**Attorneys and Law Firms**

Frederick Diaz, Comstock, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Roger W. Kinsey, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER** [1]

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se Frederick Diaz ("Diaz"), an inmate
in the custody of the New York State Department
of Correctional Services ("DOCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants,
the DOCS Commissioner and seven DOCS employees,
violated his constitutional rights under the First, Eighth,
and Fourteenth Amendments. Compl. (Dkt. No. 1).
Presently pending is defendants' motion to dismiss
pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 25. [2] Diaz
opposes the motion. Dkt. No. 27. For the following
reasons, it is recommended that defendants' motion be
granted.

## I. Background

The facts are related herein in the light most favorable to
Diaz as the non-moving party. *See* subsection II(A) *infra.*

### A. Work Placement

On April 3, 2006, Diaz was transferred to Auburn
Correctional Facility ("Auburn"). Compl. ¶ 14. Upon
arrival at Auburn, Diaz was immediately verbally
harassed by defendant Redmond, a Lieutenant. *Id.* ¶ 15. [3]
Shortly after his arrival, Diaz sought an employment
placement. *Id.* ¶ 16. Diaz claims that he was not offered
an appointment "commensurate with his education and
skills, despite the fact that all the other inmates were
being given programs of [their] choosing." *Id.* When Diaz
protested, his privileges were limited. *Id.*

While on limited privileges, Diaz was repeatedly denied
access to recreation, showers, and the law library, ordered
to double bunk with another inmate, and placed in
keeplock [4] when he refused the double bunking order.
Compl. ¶ 17. During this time, Diaz continued to attempt
to secure an employment position in the Shop Gate. *Id.* ¶
21. Diaz was told that he was not permitted to join such a
program, which he later learned was untrue, so he wrote
multiple letters and grievances to defendant Graham, the
Auburn Superintendent. *Id.* Graham responded that Diaz
would still not be assigned to the Shop Gate program,
regardless of whether it was permitted pursuant to internal
policies and regulations. *Id.* As Diaz was continually
offered nothing other than a porter position, he decided
to run for a membership spot in the Inmate Grievance
Resolution Committee (IGRC). [5] *Id.* ¶ 20.

The day after Diaz won the IGRC election, Graham
approached him and offered a deal. Compl. ¶ 22. If Diaz
resigned from his position on the IGRC, he would be given
an employment placement in the law library and could join
the Inmate Liason Committee. *Id.* Diaz accepted the offer
and resigned. *Id.* [6]

Diaz commenced working in the law library under the
supervision of defendants Burdick and Merville, both
corrections officers. Compl. ¶ 23. Burdick and Merville
attempted to incite the other inmate library clerks into

an altercation with Diaz, telling the other inmates that Diaz was a "snitch," and promoting Diaz to a coveted position over other inmate clerks who had been employed longer. *Id.* Shortly after Diaz refused the promotion, on December 27, 2006, Burdick issued a retaliatory misbehavior report against Diaz for his failure to report to work. *Id.* ¶ 24. According to Diaz, the schedule was changed without his knowledge and he was not scheduled to work that shift. *Id.*

**\*2** At the subsequent disciplinary hearing, Diaz was found guilty for failing to attend work, sentenced to ten days keeplock [7], and referred back to the Program Committee for a new job assignment. Compl. ¶ 25. Diaz claims that Burdick and Merville tolerated known homosexual activity and drug use among the other inmate clerks, allowing them to retain their employment in the law library despite being adjudged guilty of more serious disciplinary infractions with led to longer disciplinary sentence dispositions. *Id.* ¶ 28. However, due to Diaz's propensity to file grievances, he was terminated from his position in the law library despite his minor disciplinary infraction. *Id.* ¶¶ 28, 30. Diaz was again offered the porter position by the Program Committee, which he accepted, despite the fact that it was given to him with "absolutely no consideration of [his] education and skills ...." *Id.* ¶ 30.

### B. Misbehavior Report for May 21, 2007 and Subsequent Disciplinary Hearing

On May 21, 2007, defendant Quinn, a Lieutenant, was sent to interview Diaz and investigate the claims alleged in Diaz's grievance against Sgt. Cox, a non-party here. [8] Compl. ¶ 37. Quinn called Diaz into an interview room, but was not concerned with investigating Diaz's concerns, as instead he "began to berate [Diaz] about his grievances." *Id.* ¶ 38. During the interview, Quinn asked to see Diaz's identification ("ID") card. *Id.* ¶ 39. Diaz produced the ID card, which did not have a program sticker on it. *Id.* Quinn threatened to place Diaz in keeplock for having improper documentation, but Diaz stated that his card had recently been lost during transport and the replacement did not have a sticker. *Id.* Quinn then asked Diaz why he had not reported to his assigned work program as a porter, and Diaz responded that he was not called out to work that day. *Id.* ¶ 40. At this point, Quinn exited the interview room and ordered Diaz to report to work. *Id.* Upon exiting the room, Diaz

told Quinn not to contact him again. *Id.* ¶ 41. Quinn ordered Diaz onto the wall, Diaz was "roughly" pat frisked, and threatened again by Quinn who stated that the policies and procedures of Auburn did not apply to the corrections officers there. *Id.* Before being returned to his cell, Diaz was informed that he was being sent to the Special Housing Unit ("SHU") [9] for not reporting to work that day. *Id.* ¶ 43.

Quinn charged Diaz with "refusing a direct order and refusing to accept a program assignment by the Program Committee." Compl. ¶ 45. On May 26, 2007, defendant Redmond. a Lieutenant, presided over the disciplinary hearing for the aforementioned misbehavior report. *Id.* ¶ 46. Diaz contends that the misbehavior report was false because (1) he never told Quinn he removed his program sticker, (2) Diaz did accept the porter assignment from the Program Committee or else he would have been on limited privileges, and (3) he did not fail to refuse a direct order as he had never been called for his employment on May 21. *Id.* Diaz could not develop his defense during the hearing because Redmond failed to let him ask Quinn any questions. *Id.* While Diaz was waiting for the verdict of the hearing, he was placed in a holding room. Compl. ¶ 47. While in that room, Diaz observed Quinn and Redmond conversing. *Id.* Then, Quinn came over to the door of the holding room and began to curse at and berate Diaz. *Id.* Ultimately Redmond found Diaz guilty and sentenced him to 120 days in SHU. *Id.* ¶ 47.

**\*3** Diaz wrote letters of complaint and grievances about Quinn and Redmond during the disciplinary hearing. Compl. ¶¶ 47, 49. Diaz also requested to see the videotape of the hearing, [10] as well as asking Graham and Fischer to view the tape. *Id.* ¶¶ 48–49, 51–52. On June 1, 2007, Graham modified Diaz's disciplinary disposition to fourteen days in SHU and forty-six days in keeplock, as well as 120 days loss of privileges. *Id.* ¶ 48. Graham's modification was affirmed on administrative appeal on July 18, 2007, and the grievances Diaz lodged in connection with this misbehavior report and disciplinary hearing were denied. *Id.* ¶ 51.

### C. Conditions of Confinement

For the forty-six days in which Diaz was housed in keeplock, he was deliberately placed in a filthy cell in retaliation for the grievances which he had previously filed

against defendants. Compl. ¶ 56. Diaz's cell (1) contained a urine-stained mattress; (2) had filthy walls and a dirty sink; (3) had a sink in need of repair; (4) required a new mattress and light bulbs; and (5) lacked a desk and foot locker. *Id.* ¶¶ 56–57. Additionally, while in keeplock, guards placed a note on Diaz's cell labeling him "total whiner," until it was subsequently removed by "a decent guard." *Id.* ¶ 57. Diaz was also denied showers for two days. *Id.* ¶ 58. In response, Diaz submitted a grievance against the staff. *Id.*

### D. Disciplinary Hearing on June 26, 2007 and Subsequent Misbehavior Report and Disciplinary Hearing

On June 26, 2007, Byrne presided over one of Diaz's disciplinary hearings. Compl. ¶ 60. [11] During the hearing, Diaz interrupted Byrne when he began to read the misbehavior report out of context. *Id.* ¶ 62. Byrne strenuously advised Diaz not to interrupt him further. *Id.* This escalated into a verbal altercation, whereupon Diaz got up to leave the hearing and Byrne ordered him to stop. *Id.* ¶¶ 62–63. Defendant Cady, a corrections officer who was also present at the disciplinary hearing, prevented Diaz from leaving the room. *Id.* ¶ 63. Diaz was then assaulted by both Byrne and Cady. *Id.* ¶¶ 63–64. Additional officers responded to the altercation and also began to batter Diaz alongside Byrne and Cady. *Id.* ¶ 64. Throughout the entire assault, an audiotape was running, which was supposed to be recording the disciplinary hearing. *Id.* ¶¶ 62–64. Byrne ultimately found Diaz guilty of the disciplinary infraction, sentenced him to thirty days keeplock, and also issued Diaz a misbehavior report for assaulting an officer. *Id.* ¶¶ 69–70. Diaz's disciplinary disposition was upheld by Graham, despite the fact that he listened to the audiotape of the disciplinary hearing. *Id.* ¶ 68. However, on August 1, 2007, the misbehavior report was "expunged from [Diaz's] record per Supt. Graham," overturning the thirty day disciplinary disposition. *Id.* ¶ 69.

**\*4** On July 2, 2007, a disciplinary hearing was held for the misbehavior report for the altercation on June 26. Compl. ¶ 71. During the hearing, the audiotape from June 26 was played, which was allegedly altered. *Id.* ¶ 72. When Byrne was questioned about the tape's authenticity, he explained he paused the tape player during the hearing in order to converse privately with Diaz. *Id.* ¶ 73. On July 9, 2007, Diaz was found guilty of assaulting Byrne and Cady and sentenced to eight months in SHU. *Id* .

¶ 74. Graham affirmed the disciplinary disposition. *Id.* On September 13, 2007, the conviction and sentence were report was reversed on administrative appeal due to the altered audiotape. *Id.* ¶ 75.

### E. Destroyed Property

Diaz also claims that when he was sent to SHU or keeplock, the retaliation against him was exacerbated and perpetuated by defendants throwing away and damaging his personal property. Compl. ¶¶ 53, 77. Diaz wrote letters to Graham complaining about the destruction of his property, but no investigation was ever commenced. *Id.* ¶ 53.

## II. Discussion

In his complaint, Diaz alleges that his First Amendment rights were violated when defendants continually authored false misbehavior reports against him for filing grievances. Additionally, liberally reading the complaint, Diaz contends that his Eighth Amendment rights were violated when he was subjected to (1) unconstitutional conditions of confinement during his forty-six days in keeplock and (2) excessive force by defendants Byrne and Cady during his disciplinary hearing. Lastly, Diaz asserts that his Fourteenth Amendment rights were violated when he was subjected to (1) multiple false misbehavior reports, (2) faulty procedural due process during disciplinary hearings, (3) damaged personal property, [12] and (4) an Equal Protection violation as Diaz was terminated from his job position in the library when other similarly situated inmates were allowed to continue with their employment placement. Defendants assert that (1) Diaz has failed to demonstrate the personal involvement of defendants Fischer, Quinn, and Graham; (2) there is no merit to Diaz's due process, retaliation, or equal protection claims; (3) the Eleventh Amendment bars suit of defendants in their official capacities; [13] and (4) defendants are entitled to qualified immunity.

### A. Legal Standard

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to

dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

**\*5** Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950–51.

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest .... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations,.. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a

party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

### B. Conditions of Confinement

To the extent that, liberally reading Diaz's complaint, such a claim is raised, it is without merit. First, Diaz fails to identify the individuals responsible for his placement and care in keeplock." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Second, "[t]he Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1970). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted). Thus, "[c]onditions of confinement only constitute an Eighth Amendment violation if they involve the deprivation of a single identifiable human need or denial of the minimum civilized measure of life's necessities, and the defendants' state of mind was one of deliberate indifference to that deprivation." *Johnson v. Smith,* No. 9:03CV1050 (FJS/DEP), 2006 WL 1843292, at \*9 (N.D.N.Y. June 29, 2006) (Scullin, J.) (citations omitted).

**\*6** The objective prong can be satisfied by

> conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.

*Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 304–05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety" *Farmer,* 511 U.S. at 834 (citations omitted).

Diaz claims that while in keeplock, he had a stained mattress, dirty walls and sink, and lacked a desk and foot locker. However, Diaz has failed to show how these conditions rose to the level of substantial risk of serious harm or denial of an identifiable human need. *See Davidson,* 371 F.Supp.2d at 370. Diaz makes no contention of how a dirty wall and sink and stained mattress inhibited his ability to eat, sleep, or remain at an adequate temperature. Additionally, there are no claims for illness or injury. At best, these are conclusory allegations that are wholly insufficient to state an Eighth Amendment violation. Moreover, Diaz's claims that he was not offered a shower for two days are also insufficient to state an Eighth Amendment violation. *See Beckford v. Portuondo,* 151 F.Supp.2d 204, 211 (N.D.N.Y.2001) (citations omitted) ("Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers."); *see also Cosby v. Purkett,* 782 F.Supp. 1324, 1329 (E.D.Mo.1992) (holding that access to showers every seventy-two hours is not a violation under the Eighth Amendment). Accordingly, Diaz has failed to establish the objective element of the analysis.

Lastly, as discussed *supra,* verbal harassment alone is insufficient to allege a constitutional violation. Accordingly, defendants' motion as to any such claim should be granted.

### C. Personal Involvement

Defendants contend that Diaz has failed to allege the personal involvement of Fisher, Quinn, and Graham. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950

F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

> **\*7** (1)[T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

### 1. Fischer

A position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *Wright,* 21 F.3d at 501. Thus, Fisher cannot be held liable solely because he, as Commissioner, held a supervisory position. The gravamen of Diaz's Complaints against Fischer is that he was continually written to, and failed to respond. Compl. ¶¶ 29, 3, 52, 76. However, failure to respond to a grievance is insufficient to allege personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ( "Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] ...."). Additionally, there were no allegations, nor does the record support any contentions, that Fischer was directly involved in any of the alleged violations, that Fischer failed to remedy a wrong of which he was informed, that he was grossly negligent in supervising subordinates, or that he was deliberately indifferent to the health and safety of Diaz.

Accordingly, defendants' motion should be granted and Fischer should be dismissed from the present action.

### 2. Quinn

Diaz has unequivocally alleged that Quinn was directly responsible for writing a false misbehavior report on May 21, 2007, and also influenced Redmond's decision at his subsequent disciplinary hearing on May 26, 2007. Compl. ¶¶ 45, 47. As such, Diaz has plausibly contended that Quinn was responsible for his alleged constitutional violations. Whether there is any substantive merit to said violations is a separate issue and discussed *infra*. Accordingly, defendants' motion on this ground as to Quinn should be denied.

### 3. Graham

As previously discussed, holding a supervisory position, without more, is insufficient to allege personal involvement. *Wright,* 21 F.3d at 501. Additionally, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."). Defendants argue that Diaz's contentions center around Graham's lack of response to his complaints. However, Diaz alleges that Graham personally investigated and acted on Diaz's complaints. For example, Graham allegedly listened to the audiotape of the June 26, 2007 disciplinary hearing before affirming both disciplinary dispositions. Compl. ¶ 74.

**\*8** Additionally, Diaz contends that after the May 26, 2007 disciplinary hearing, he asked Graham to review the videotape of the hearing, thus providing Graham with notice of a constitutional violation which was allegedly ongoing with his continued segregation. Graham refused to review the tape prior to affirming the disciplinary disposition.

> It has been held that "an appropriate guiding principle" for determining personal responsibility is where a grievance alleges an "ongoing" constitutional violation, the supervisory official who reviews the grievance is "personally involved" if he is confronted with a situation that he can remedy directly. If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to "remedy" a violation.

*Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008) (internal citations omitted). Thus, Graham's knowledge was not that of a "violation ... that has already occurred and is not ongoing," it was continuous and his failure to remedy the situation is sufficient to allege personal involvement. *Id.*

Accordingly, defendants' motion on this ground as to Graham should be denied.

### D. Retaliation

To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). "Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008) (*citing Graham,* 89 F.3d at 79). Additionally, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.* Conclusory allegations alone are insufficient. *Id.* (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).).)

First, as discussed *infra* section II(E)(2), Diaz's misbehavior reports were written for a proper purpose. Additionally, Diaz has failed to allege or prove facts to support a retaliation claim against Merville and Burdick. The misbehavior report which Burdick authored, and Merville endorsed, occurred shortly after Diaz refused to accept a promotion. Compl. ¶¶ 23–24. Diaz's

employment status does not represent a constitutionally protected activity. *See supra* note 4. Thus, this cannot provide a basis by which to assert a retaliation claim. Instead, Diaz appears to rely upon his grievances as his constitutionally protected conduct. Compl. ¶¶ 28, 30. While filing grievances is an activity protected by the First Amendment, Diaz fails to identify a time when he filed grievances against Merville and Burdick prior to the issuance of the allegedly false misbehavior report. Thus, defendants' adverse actions of filing the misbehavior report could not be a substantial factor in the alleged retaliation because the grievances against them were filed *after* the misbehavior report, not before. Furthermore, conclusory and general allegations that Diaz was retaliated against because of his reputation for filing grievances in the past is insufficient to maintain the present claim. *Jackson,* 549 F.Supp.2d at 215.

**\*9** Similarly, Diaz has failed to allege or prove facts to support a retaliation claim against Quinn. Quinn investigated a grievance which Diaz filed against an unnamed corrections officer. Throughout the interview, Diaz and Quinn exchanged words, Quinn ordered Diaz to report to work, Diaz left the interview and failed to report to work, and was given a misbehavior report for failing to follow a direct order and participate in his programming. Compl. ¶¶ 38–45. Diaz filed a grievance against Quinn after the disciplinary hearing took place. *Id.* ¶¶ 47, 49. As previously discussed, this constitutionally protected activity occurred *after* the adverse action of the misbehavior report, and not before. Thus, the grievances could not serve as a substantial cause for the report. Furthermore, conclusory and general allegations that Diaz was retaliated against because of his reputation for filing grievances in the past is insufficient to maintain the present claim. *Jackson,* 549 F.Supp.2d at 215.

The same is true, with regard to the misbehavior reports and disciplinary hearing occurring prior to June 2007, for Graham. Graham's actions in affirming the hearing decisions were allegedly in retaliation for Diaz's filing of grievances against the other defendants. These conclusory allegations are insufficient to plausibly state a retaliation claim.

Accordingly, defendants' motion on this ground should be granted.

### E. Due Process

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a SHU confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in SHU as well as "the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

### 1. Preclusion

Diaz alleges due process violations occurring during his disciplinary hearing in connection with the December 27 misbehavior report and the hearing on May 26, 2007 in connection with the May 21 disciplinary report. However, such claims run afoul of the "favorable termination" rule of *Heck v. Humphrey,* 512 U.S. 477, 487–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid in order to recover damages under § 1983. This rule apples to challenges to procedures used in prison disciplinary proceedings. *Edwards. v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997).

**\*10** There is no evidence that Diaz's disciplinary determinations were ever vacated with regard to these two proceedings. [14] While Diaz's sentence was modified with respect to the May 26 hearing, it was never overturned or expunged. Thus, the *Heck* rule still applies and any

procedural challenges are barred. Therefore, because Diaz's recovery of damages here for a false misbehavior report would necessarily imply the invalidity of his conviction, the based on that hearing is barred.

Accordingly, defendants' motion should be granted as to these claims.

### 2. False Misbehavior Reports

An inmate has a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988)).

As discussed *supra,* Diaz has failed to establish facts sufficient to allege a retaliation claim. Thus, the present claim must also fail. Moreover, as discussed *supra,* such a finding of a false misbehavior report runs afoul of *Heck* and its progeny. Finally, as established by the record, Diaz's misbehavior reports were supported by sufficient evidence.

In the first case, Diaz does not dispute that the schedule indicated that he needed to be at work and he was not there. Compl. ¶ 24. The factual issues of when the schedule was changed and what it actually indicated were determined at the hearing, which concluded with a finding of guilt and has not been overturned. Similarly, the second misbehavior report cited Diaz's failure to follow a direct order and participate in his employment. Quinn's order to Diaz to report to work, whether or not he was previously called out, was a direct order with which Diaz failed to comply. *Id.* ¶¶ 40, 43, 45. Any other factual issues were necessarily addressed during the disciplinary hearing which resulted in a finding of guilt which was never expunged or overturned. Accordingly, in both cases, Diaz was found guilty of the offense charged. Such findings were also consistent with the allegations in the complaint. While there are some disputed facts as to why the schedule was incorrect or whether Diaz was actually called for

work, those facts were determined in the disciplinary hearings.

Accordingly, defendants' motion should be granted as to these claims.

### 3. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) ("To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

> **\*11** [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Vegas v. Artus,* 610 F.Supp.2d 185, 209 (N.D.N.Y.2009) (internal quotation marks and citations omitted). In the prison setting, inmate treatment is evaluated pursuant to a rational basis standard. *Phillips,* 408 F.3d at 129 (citing *Shaw v. Murphy,* 532 U.S. 223, 229–230, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001)). Thus, in order to establish an equal protection violation, the plaintiff must show that "the disparity in treatment cannot survive the appropriate level of scrutiny which ... means that he must demonstrate that his treatment was not reasonably related to any legitimate penological interests." *Id.*

If an inmate cannot "allege membership in [a protected] class, he or she can still prevail in ... a class of one equal protection claim." *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005) (internal quotations and citations omitted). Similarly, to succeed, plaintiffs must show "that they were intentionally treated differently from other similarly-

situated individuals without any rational basis." *Clubside, Inc. v. Valentin,* 468 F.3d 144, 158–59 (2d Cir.2006). Additionally, to be successful, plaintiff must establish an extremely high "level of similarity between plaintiffs and the persons with whom they compare themselves ...." *Neilson,* 409 F.3d at 104.

Here, Diaz contends first that he was not given the preferential employment treatment he deserved when he made a deal with Graham. Compl. ¶ 22. As the Equal Protection Clause bars deprivations and unequal treatment, such claims for preferential treatment are not within its bounds. Moreover, Diaz fails to allege facts sufficient to conclude that others who made similar deals with Graham were treated differently.

Additionally, Diaz claims that the sanction of losing his employment was more severe than that received by other inmates who had been adjudged guilty of more serious disciplinary infractions and sentenced to more severe dispositions. Such general claims fail to identify which individuals intentionally treated him differently. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) ( "To prove an equal protection violation, claimants must prove purposeful discrimination, directed at an identifiable ... class."). The named defendants did not appear to have any involvement in Diaz's employment placement. At Diaz's hearing, he was referred back to the Inmate Program Committee for assignment. Compl. ¶ 25. This committee, the members of which are not named in the present action, appears to have the authority to place inmates in a job assignment. The moving defendants are neither on the Program Committee nor vested with the authority to provide Diaz with employment options. Reliance on Fischer or Graham for such power is neither alleged nor inferable from the record. Additionally, none of the other moving defendants acted as hearing officers or imposed Diaz's sentences. Thus, no evidence has been proffered that any moving defendant purposefully discriminated against Diaz.

**\*12** Accordingly, defendants' motion should be granted as to the equal protection claim.

### F. Qualified Immunity

Defendants claim that they are entitled to qualified immunity. Qualified immunity generally protects

governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov.10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03–CV–1157, 2006 WL 839525 \*16 (N.D.N.Y. Mar. 27, 2006) (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached concerning Diaz's claims because, as discussed *supra,* accepting all of Diaz's allegations as true, he has not shown that defendants violated his constitutional rights.

Accordingly, in the alternative, defendants' motion should be granted on this ground.

### III. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 25) be **GRANTED** in all respects and that the complaint be **DISMISSED** as to defendants Fischer, Graham, Quinn, Redmond, Burdick, and Merville as to all claims against them.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS**

**WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1132772

## Footnotes

1 This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2 The motion is filed on behalf of all defendants except Byrne and Cady. Dkt. No. 25 at 2. Byrne and Cady have both filed answers. Dkt. Nos. 26, 39.

3 Allegations of verbal harassment alone are not actionable under § 1983. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996) ( "The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly d ism issed.").Therefore, even when the allegations of the complaint are liberally construed, the allegations here afford no basis for a claim under § 1983 and will not be further addressed.

4 "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6.

5 "DOCS maintains an Inmate Grievance Program (IGP)at all facilities. The first step requires an inmate to file a grievance with the IGRC. If such informal resolution fails, the inmate may then appeal to the facility superintendent and thereafter to the Central Office Review Committee. *See Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004).

6 To the extent that, liberally reading the complaint, Diaz contends that he should have received, or continued to occupy, a specific employment placement, such contentions are without merit. Prisoners do not have a constitutionally protected property interest in a certain employment or in continued employment. *See Johnson v. Rowley,* 569 F.3d 40, 43–44 (2d Cir.2009); *see also Bulger v. United States Bureau of Prisons,* 65 F.3d 48, 50 (5th Cir.1995) (finding that termination and reassignment to a different job within the prison setting is neither atypical nor significant in relation to ordinary prison life); *Newsom v. Norris,* 888 F.2d 371, 374 (6th Cir.1989) (holding that "the Constitution does not create a property or liberty interest in prison employment and that any such interest must be created by state law by language of an unmistakably mandatory character.") (citations and quotation marks omitted); *Karacsonyi v. Radloff,* 885 F.Supp. 368, 370 (N.D.N.Y.1995) ("Prison officials, however, have broad discretion in denying federal inmates the opportunity to [work].") (citations omitted). Additionally, the Second Circuit has held that a "New York [state] ... prisoner has no protected liberty interest in a particular job assignment." *Frazier v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996); *Hodges v. Jones,* 873 F.Supp. 737, 745 (N.D.N.Y.1995) (citations omitted) (holding that inmates "ha[ve] no constitutional right to any particular position of employment."). Accordingly, as a matter of law, Diaz has no liberty interest in his initial, or continued, employment, or any choice in which employment he should be assigned.

7 "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (2007).

8 On May 15, 2007, Sgt. Cox presided over one of Diaz's disciplinary hearings. Compl. ¶ 35. During the hearing, Cox threatened Diaz, insisting that unless Diaz stopped filing grievances he would be subjected to "man law" by having fabricated charges brought against him, being assaulted by staff, and being sent to solitary confinement. *Id.*

9 SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

10 Diaz viewed the tape on June 27 It allegedly showed Diaz in the holding room, Quinn entering the room and conversing with Redmond, Quinn moving to the door of Diaz's room and exchanging words, and then Quinn returning to speak with Redmond. Compl. ¶ 50.

11 It is unclear what the disciplinary infraction was for which Diaz was being tried. However, Diaz and Byrne had previously met as Byrne interviewed Diaz about previous grievances he had submitted. Compl. ¶ 61. Prior to the hearing, Diaz inquired about the status of his grievance investigation and Byrne was very agitated by Diaz's questions.

12 An inmate has a right not to be deprived of property without due process. However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue. *Hudson v. Palmer,*

468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). "New York courts provide such a remedy ... [through the] initiat[ion of] an Article 78 proceeding in New York Supreme Court ...." *Gabis v. New York City Taxi & Limousine Comm'n,* No. 05–CV–8083 (HB), 2005 WL 2560384, at *3 (S.D.N.Y. Oct.12, 2005); *see also* N.Y. C.P.L.R. §§ 7803, 7804; *Locurto v. Safir,* 264 F.3d 154, 174 (2d Cir.2001) ("An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims.") (citations omitted); *Campo v. New York City Employees' Ret. Sys.,* 843 F.2d 96, 101 (2d Cir.1988) ("Article 78 ... provides a summary proceeding which can be used to review administrative decisions."). State law also provides that "[a]ny claim for damages arising out of any act done ... within the scope of ... employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state." N.Y. Corr. Law § 24(2). In this case, Diaz contends that there were unconstitutional deprivations when his property was destroyed by corrections officers. Compl. ¶¶ 53, 77. First, the Article 78 procedure exists. Second, because Diaz is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24. Thus, the correct venue to litigate these claims is in state court. Accordingly, defendants' motion should be granted as to this claim.

13      Diaz has clarified, in his opposition papers, that he "is suing the defendants in their individual capacities [and] ... refer[ed] to the official title .. for reference purposes only ...." Dkt. No. 27. Accordingly, since Diaz clearly sues the defendants only in their individual capacities, the Eleventh Amendment bar to suits against state officials in their official capacities is inapplicable.

14      Diaz's claims concerning the June 26, and July 2, 2007 disciplinary hearings are not raised in the present motion.

---

          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    11

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr. Facility; James A. Mance, Deputy Superintendent of Programs; John O'Reilly,[FN1] Deputy Superintendent; J. Burge, First Deputy; M. Maher, DSS; R. Centore, Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and the docket confirms that defendant John O'Reilly has never been served. Service must be made upon a defendant within 120 days of filing the complaint or any claims against that defendant will be dismissed. See Fed.R.Civ.P. 4(m). The original complaint, which named O'Reilly, was filed on November 26, 1999, and the amended complaint was filed on July 13, 2001. However, O'Reilly was never served. Since this defendant has never been served, this court lacks jurisdiction over him, and this court recommends the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.

Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York, Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

REPORT-RECOMMENDATION

SHARPE, Magistrate J.

I. *Introduction* [FN2]

> FN2. This matter was referred to the undersigned for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

**\*1** Plaintiff, *pro se* Troy Garrett filed an action under 42 U.S.C. § 1983 claiming that the defendants violated his civil rights when they retaliated against him for his activities as an IGRC representative by subjecting him to verbal harassment, physical abuse and subsequently, a transfer. Garrett also claims that the supervisory defendants failed to properly investigate his complaints and failed to train/supervise their employees. This court recommends denying the motion for summary judgment in part and granting it in part.

II. *Procedural History*

On July 13, 2001, Garrett filed an amended complaint against the defendants claiming that they violated his civil rights under the First, Sixth Eighth, and Fourteenth Amendments.[FN3] On September 28, 2001, the defendants filed a motion for summary judgment. On January 18, 2002, this court issued an order informing Garrett of his obligation to file a response and extended his time to respond for thirty days. On April 24, 2002, this court granted an additional sixty days to respond to the defendants' motion. Despite having been given multiple opportunities to respond, Garrett has failed to file a response.

> FN3. Although Garrett claims to be raising violations under the Sixth, Eighth, and Fourteenth Amendments, the only viable claim based on this court's interpretation of the complaint is under the First Amendment for retaliation.

III. *Facts* [FN4]

> FN4. The facts are taken from the defendants' statement of undisputed material facts since Garrett failed to file a response.

On June 17, 1999, Garrett filed a grievance against

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [FN6] to the Mid-State Correctional Facility.

FN6. The defendants suggest that Garrett has failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)*(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> FN7. The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacities. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,*[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129

(N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged violation of rights. *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

(Cite as: 1999 WL 9847 (S.D.N.Y.))

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lawrence SHUSTER, Plaintiff,
v.
NASSAU COUNTY, et al., Defendants.
No. 96 Civ. 3635(JGK).

Jan. 11, 1999.

Lawrence Shuster, Fountain Valley, CA, for the Plaintiff, pro se.

Gina M. Amorini, Mineola, NY, for Nassau County.

Michael Kennedy, Assistant Attorney General, Office of the Attorney General, Division of State Counsel, Litigation Bureau, New York, NY, for Hon. Zelda Jones & NYS Dept. of Motor Vehicles.

*OPINION AND ORDER*

KOELTL, J.

**\*1** The plaintiff filed this action against various defendants alleging false arrest and malicious prosecution for violations of the New York Vehicle and Traffic Law (VTL). The docket sheet reflects that the complaint was filed on May 15, 1996. Defendants Judge Zelda Jonas, the New York State Department of Motor Vehicles (collectively, the "State defendants"), and Nassau County, who have not answered or moved with respect to the complaint or the amended complaint, have requested that the amended complaint be dismissed pursuant to Rule 4(m) of the Federal Rules of Civil Procedure because they have never been properly served with the summons and complaint or amended complaint. The docket sheet in this action does not reflect any service on any defendant. The Court therefore by Order dated February 17, 1998 directed the plaintiff to advise the Court in writing why this action should not be dismissed for failure to serve the summons and complaint on the defendants within 120 days of filing of the complaint. While the plaintiff has responded, it is

clear that he has never properly served any of the defendants.

I.

Rule 4(m) authorizes a court upon motion to dismiss an action without prejudice as against a defendant if service of the summons and complaint is not made upon that defendant within 120 days after the filing of the complaint. This Rule also authorizes courts to dismiss an action sua sponte, provided that the court first gives notice to the plaintiff. *See* Fed.R.Civ.P. 4(m); *see also* Gowan v. Teamsters Union (237), 170 F.R.D. 356, 359-60 (S.D.N.Y.1997) (dismissing action filed by a pro se, in forma pauperis plaintiff pursuant to Rule 4(m)).

Separate rules govern service upon state agencies and upon individuals. Under the Federal Rules of Civil Procedure, "[s]ervice upon a state ... or other governmental organization ... shall be effected by delivering a copy of the summons and of the complaint to its chief executive officer or by serving the summons and complaint in the manner prescribed by the law of that state...." Fed.R.Civ.P. 4(j)(2). Service upon an individual is made by delivering a copy of the summons and complaint to the individual personally, by leaving a copy thereof at the individual's dwelling house or usual place of abode with a person of suitable age and discretion residing there, or by delivering a copy to an agent authorized to receive service of process. *See* Fed.R.Civ.P. 4(e)(2). The rule further provides that an individual may also be served in accordance with state law. *See* Fed.R.Civ.P. 4(e)(1).

Under New York law, a state officer sued in an official capacity or a state agency must be served by:

(1) delivering the summons to such officer or to the chief executive officer of such agency or to a person designated by such chief executive officer to receive service, or (2) by mailing the summons by certified mail, return receipt requested, to such officer or to the chief executive officer of such agency, and by personal service upon the state in the manner provided by subdivision one of this section.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

(Cite as: 1999 WL 9847 (S.D.N.Y.))

**\*2** N.Y. C.P.L.R. 307(2). Subdivision (1) provides that "personal service upon the state shall be made by delivering the summons to an assistant attorney-general at an office of the attorney-general or to the attorney-general within the state." Hence, "[s]ervice on a state officer may be made either by personal delivery to the officer or by certified mail to the officer. Service on a state agency may be made either by personal delivery to the chief executive officer of the agency (or the chief executive's designee) or by certified mail to the chief executive." N.Y. C.P.L.R. 307(2) supplemental practice commentaries (McKinney 1998).

The New York rules for serving an in-state natural person parallel Fed.R.Civ.P. 4(e)(1), but with additional requirements. Like Rule 4, service may be by personal delivery to the person being served, see N.Y. C.P.L.R. 308(1), or to a duly appointed agent for service. See N.Y. C.P.L.R. 308(3). Service may also be made by delivering the summons to a person of suitable age and discretion at the actual place of business, dwelling place, or usual place of abode of the person to be served, provided that the summons is also mailed to that person's last known residence or sent by first class mail to that person's actual place of business. See N.Y. C.P.L.R. 308(2).

In addition, where service under sections 308(1) and (2) cannot be made with due diligence, service may be effected by nailing the summons to the door of the actual place of business, dwelling place, or usual place of abode of the person to be served, and by mailing the summons to that person at his or her last known residence or by sending the summons by first class mail to that person's actual place of business. See N.Y. C.P.L.R. 308(4). Under sections 308(2) and (4), the delivery and mailing must occur within twenty days of each other. See N.Y. C.P.L.R. 308(2) & (4).

II.

On May 15, 1996, the plaintiff filed the original complaint in this action. On August 14, 1996, the plaintiff filed an amended complaint. In February 1998, well past the 120-day limit for timely service of process, the State defendants requested dismissal of the action pursuant to Rule 4(m). (See Letter from Michael Kennedy dated Feb.

13, 1998). The plaintiff was ordered to advise the Court by March 2, 1998 why the case should not be dismissed on that basis. (See Order dated Feb. 17, 1998). The plaintiff filed a response dated February 17, 1998. The plaintiff also filed a response received on August 13, 1998. In August 1998, more than two years after the original complaint was filed and nearly two years after the amended complaint was filed, the State defendants and defendant Nassau County requested dismissal of this action on the grounds that they still had not been served. (See Letter from Michael Kennedy dated Aug. 3, 1998; Letter from Gina Amorini dated Aug. 3, 1998).

(A)

The plaintiff does not argue that he complied with Rule 4 by delivering the summons and complaint to the chief executive officer of the DMV. Nor does he allege that he delivered the summons and complaint to Judge Jonas, who is sued in her personal and official capacities, personally or to a person of suitable age and discretion at Judge Jonas' dwelling place or usual place of abode. Nor has there been compliance with N.Y. C.P.L.R. 307(2) with respect to either the DMV or Judge Jonas. With respect to the DMV, there has been neither personal delivery to the chief executive officer of the DMV or the chief executive's designee or by certified mail to the chief executive with personal service on an assistant attorney-general or the attorney-general. The plaintiff also has not complied with similar provisions with respect to Judge Jonas.

**\*3** Instead, the plaintiff contends that he had served the State defendants by twice delivering the summons and complaint to the Nassau County Regional Office of the State Attorney General, on July 30, 1996 and February 6, 1998. (See Return of Service (unsigned), attached to Feb. 17, 1998 Shuster Letter). To support his argument that service on the Nassau office constituted effective service on the State defendants, the plaintiff submitted a copy of a letter from the Office of the Attorney General stating that its Nassau office would accept service on behalf of, among others, Judge Zelda Jonas in a different action. In addition, he argues that the complaint was also attached to the Order to Show Cause which was served on the Nassau office. (See Order to Show Cause attached to Feb. 17, 1998 Shuster Letter). The plaintiff also argues that under New York State law, service on the Attorney General's Office is sufficient.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

(Cite as: 1999 WL 9847 (S.D.N.Y.))

Under New York law, delivering the summons and complaint to a regional office of the State Attorney General does not by itself constitute effective service on a state agency or an individual officer sued in her official capacity. *See Berkowitz v. New York City Bd. of Educ.,* 921 F.Supp. 963, 968 (S.D.N.Y.1996); *Dawkins v. Hudacs,* 159 F.R.D. 9, 10 (N.D.N.Y.1994); *Town of Clarkstown v. Howe,* 206 A.D.2d 377, 614 N.Y.S.2d 327, 328 (2d Dep't 1994); *Sannella v. Regan,* 111 A.D.2d 964, 490 N.Y.S.2d 61 (3d Dep't 1985). Moreover, there is no evidence that the Nassau office was authorized to accept service on behalf of the DMV. As to Judge Jonas, the fact that the Nassau office had been designated to receive service on her behalf in another case does not authorize that office to accept service for her in this case.

The plaintiff also contends that he served the State defendants by handing their attorney a copy of the complaint in this Court on or about July 30, 1996. Even if proven, this is also not sufficient under the Federal Rules and New York law unless the attorney is authorized by appointment or by law to receive service of process. *See United States v. Ziegler Bolt and Parts Co.,* 883 F.Supp. 740, 749 (Ct. Int'l Trade 1995); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1289 (S.D.N.Y.1989); *Gibbs v. Hawaiian Eugenia Corp.,* 581 F.Supp. 1269, 1271 (S.D.N.Y.1984). The plaintiff has neither alleged nor provided proof that the State defendants intended to be bound by the acceptance of the complaint by their attorney. While the authority of an attorney to accept service may be implied from the surrounding circumstances indicating the intent of the client, *J & L Parking Corp., Inc. v. United States,* 834 F.Supp. 99, 102 (S.D.N.Y.1993); *Olympus Corp. v. Dealer Sales and Serv., Inc.,* 107 F.R.D. 300, 305 (S.D.N.Y.1985), there is no evidence in this case to establish such intent. The State defendants never acted in any way to indicate that the attorney was authorized to accept service of process. The State defendants never answered the Complaint or filed a responsive pleading, and specifically asserted in correspondence that there had been no service of process. Indeed, the State defendants notified the plaintiff at least as early as February 1998 that service was insufficient. (*See* Feb. 13, 1998 Kennedy Letter).

**\*4** Although the plaintiff is acting *pro se,* his failure to comply with basic procedural rules cannot be excused, particularly in light of the fact that he is familiar with litigation. He has already filed numerous other lawsuits and numerous motions. *See, e .g., Shuster v. Eiberson,* No. CV-92-1524 (E.D.N.Y. Apr. 23, 1993); *Shuster v. Fenster,* No. 92 Civ. 2323; *Shuster v. Citibank,* No. 93 Civ. 4182, 1994 WL 267550 (S.D.N.Y. June 15, 1994); *Shuster v. Prudential Securities Inc.,* No. 91 Civ. 0991, 1991 WL 102500 (S.D.N.Y. June 6, 1991); *Shuster v. Olem,* 96 Civ.1993, 1997 WL 167046 (S.D.N.Y. Apr. 8, 1997); *Shuster v. Eiberson,* No. 97 Civ.1988, slip. op. (S.D.N.Y. Aug. 12, 1997); *Shuster v. Oppleman,* No. 96 Civ. 1689 (S.D.N.Y. filed Mar. 7, 1996); *Shuster v. Voel,* No. 96 Civ. 8240 (S.D.N.Y. filed Nov. 1, 1996). Accordingly, the State defendants' request for dismissal without prejudice pursuant to Rule 4(m) is granted.

(B)

The docket sheet also does not reflect service of process on defendant Nassau County. Fed.R.Civ.P. 4(1) requires proof of service in the form of an affidavit by the server. *See* Fed.R.Civ.P. 4(1). While it is true that, by its terms, the failure to comply with Fed. R. Civ. 4(1) does not affect the validity of the service, the plaintiff has submitted no proof of timely service for any of the defendants. Nor has the plaintiff explained how he purportedly served Nassau County pursuant to federal or state law. The plaintiff has offered no explanation for his failure to serve in response to the Court's directive or to Nassau County's letter requesting dismissal. Nor has he requested an extension of the time to serve. Because the plaintiff was given notice that the case would be dismissed absent a showing of good cause for the failure to serve the defendants, and failed to make this showing, defendant Nassau County's application for dismissal without prejudice pursuant to Rule 4(m) is also granted. *See, e.g., Urquidez v. Officer Lyon # 7505,* No. 97 Civ. 884, 1997 WL 414158 at \*1 (S.D.N.Y. July 23, 1997).

(C)

Similarly, the docket sheet also does not reflect that any of the remaining defendants named in the amended complaint have been served. They include individual

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

(Cite as: 1999 WL 9847 (S.D.N.Y.))

defendants D. Dillon, N. Levy, Richard Kramer, "Mr. Rainville," Skip Dwyer, R. Jackson, A. Aducci, and "U.S.A. (Bruce [illegible] )," each of whom is sued in his or her official and personal capacities; the Nassau County Republican Party; and unnamed "clients of Frank Cocozzelli" (collectively, the "remaining defendants"). Although the 120-day limit for service of process has long expired, courts generally consider three factors in determining whether "good cause" exists to warrant an extension of the time for service:

(1) whether the delay in service was "the result of mere inadvertence," or whether there has been a "reasonable effort" to effect service[,] ... (2) prejudice to the defendant[,] ... [and 3] whether or not the plaintiff has moved under Fed.R.Civ.P. 6(b) for an enlargement of time in which to effect service.

**\*5** *Gordon v. Hunt,* 116 F.R.D. 313, 319-21 (S.D.N.Y.1987).

These factors do not support an extension of the time to serve the remaining defendants in this case. The plaintiff was directed by the Court to explain the delay in serving the defendants but failed to do so. The plaintiff has not moved for additional time to serve any of the defendants. Moreover, to permit service at this late date would unfairly prejudice the remaining defendants. *See Gowan,* 170 F.R.D. at 359-60. The delay in proceeding against them has been excessive. Accordingly, pursuant to Rule 4(m), the case against the remaining defendants is dismissed without prejudice.

### III.

The plaintiff has also filed a partially illegible "letter and motion for order" in which he seeks an injunction to stop further court proceedings in Nassau County for alleged violations of section 511 of the New York Vehicle and Traffic Law. He argues that the injunction should be granted because all of his past violations of the Vehicle and Traffic Law have been expunged from his record. The Court has already considered and denied a similar motion by the plaintiff on the grounds that the plaintiff failed to show either irreparable harm or a likelihood of success on the merits. *See Shuster v. Nassau County,* 948 F.Supp. 282 (S.D.N.Y.1996). In the present motion, which consists of

one paragraph, the plaintiff offers no new facts to establish either of these requirements for a preliminary injunction. Therefore, the plaintiff's motion for a preliminary injunction is denied.

### IV.

The plaintiff also moves for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). This motion is plainly improper because there have been no responsive pleadings because the defendants were never effectively served. The motion is therefore denied.

### V.

The plaintiff also moves for an order directing Nassau County to send to the plaintiff a copy of the transcript of a 1996 proceeding before Judge Eiberson in which Judge Eiberson allegedly dismissed various Vehicle and Traffic Law charges against the plaintiff. To the extent that this is a discovery request, it is denied as moot.

### CONCLUSION

For the reasons explained above, this action is dismissed without prejudice. The plaintiff's motion for a preliminary injunction is denied. The plaintiff's motion for judgment on the pleadings is denied. The plaintiff's motion for an order directing Nassau County to produce a court transcript is denied as moot.

SO ORDERED.

S.D.N.Y.,1999.

Shuster v. Nassau County
Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.